This is the case where the spouse, the non-owning spouse, did not sign a consent to a mortgage transaction on the homestead. The Constitution of Texas requires such a consent to be signed. It requires that it be in writing, and no such instrument appears anywhere in the record. I know Judge Stewart was on the case of what dealt with the failure to sign consents. The Alexander case, which went into great detail about the forfeiture provisions of the failure to have a consent in the record, and we have that issue in this. The Alexander case and the other recent cases that followed it all said that the deed of the spouse, but the deed of trust in those cases expressly stated that the spouse and the parties were giving their consent to the transaction. That is actually written out in a footnote in one of the cases that followed the Kirshner v. Dirks Bank case and the Wilmington Trust case. Both of them cited the same language. This is what is missing in our case. So the bank says, well, okay, we didn't get a signed consent, but we did get the husband to sign the deed of trust, granting the lien. Not only did he sign for himself, but he signed for his wife pursuant to a power of attorney. The wife, of course, did not appear in the transaction at all. She had signed a power of attorney in connection with the transaction two years before, which in fact did close one month after she signed the power of attorney. However, there was no power of attorney for this 2007 transaction. However, they say that, well, we can imply, and the defendant, the appellee, in their brief actually uses the word imply her consent from the words of the deed of trust that we are creating a lien. Now, obviously, an implied consent is not in writing. It just — there can't be an implication from — if there's a writing, it's just stated. So we're saying that we can imply we're having to stack inference on top of inference here. We infer that the wife consented from the fact that her husband signed the deed of trust, both for himself and under the power of attorney for her. Then we have to go back, well, did — the deed of trust has some very limiting language in it. The deed of trust says, well, the non-owning spouse is signing this instrument only, only to convey her interest in the property. Transaction, an issue otherwise different than the prior refinancings?  Yes. Getting the money, the process. Yes. She had, in 2005, they had the exact same transaction two years before. The same power of attorney was used in that transaction. It was fact-increted for that transaction. But the instrument, the actual deed of trust remains the same. It says that the signing spouse is only conveying her interest, signing only for the purpose of conveying her interest, not for the purpose of agreeing to the contract, only for the purpose of conveying her interest. It says that in the 2005 and the 2007 transaction. So there's no implication that can be drawn as to her consent from that deed of trust. Then you can go back, can we imply that she consented to the transaction because she executed the deed of trust two years before, as you just pointed out? The deed of trust, I mean, the power of attorney itself says that it is limited to certain aspects of the transaction that are necessary to close. Now we know it's not necessary for the wife or the spouse to close, I mean, to sign in the transaction on the homestead, because they did it in this case, they did it in the Alexander case, they did it in the Kyle case, which I cited. The wife's signature was forged in the Kyle case, that's the case most similar to ours, and the Court held, no, it's no good, it's no good. In our case, the power of attorney was not effective to convey any consent, because by its terms it did not include that. If you go back a step further, and the power of attorney was not executed with the formalities required by law, and that one, the main formality being that it was not executed in the manner that is required for the protection of the wife that is at a lawyer's office, at the title company, or at the lender's office, it was executed in the doctor's office by his own secretary, who is a notary. So the power of attorney itself does not allow us to give rise to an implication that she agreed to consent to her homestead being mortgaged by reason of her signing the power of attorney. So your bottom line on that point, what's the narrow holding you want for us? I mean, obviously, the Texas Constitution is at issue, the power of the Commission, et cetera. So at this point, what's the narrow holding you're looking for us here to declare that the absence of the valid power of attorney invalidated the entire transaction? Yes. If the power of attorney can be used for transactions, as long as it's done with the proper safeguards to the spouse, and as part of the transaction, not as part of a different transaction at a different time. In other words, there's no way you could figure she was aware of or intended to or impliedly consented to a transaction that was not even in the mind of man in 2005 when she signed. All right. Articulate for me what the point of law is that we would be stating vis-à-vis the Texas law, given what you're arguing. Yes, sir. The real essential point is that without a spousal consent, there can be no lien enforceable against the homestead where you're dealing with a home equity loan. Based on the Texas Constitution? Constitutional law. And that hasn't — wasn't changed by anything. The court restated that, the Texas Supreme Court restated that just a month after I got involved in this case. It hit me like a ton of bricks, that they're saying that these things are to be enforced. And I was there trying to work out a settlement, and I said, well, my gosh, she didn't ever agree to it. She never consented to it. So what can I — Sounds like you're asking us to hold that a durable power of attorney can only be used one time. No. No. Not at all. I'm just saying this durable power of attorney did not contemplate this transaction, and it cannot be used as a basis for implying her consent. That's what the judge below wanted to do. He could see there was no real consent anywhere. He said, we can imply it from the fact that she signed all of these things, that her husband signed all of these things on her behalf. You lose me a little bit, because you told me that this transaction otherwise isn't different than this whole series of, you know, refinancings, right? It's — This was — Qualitatively, it's more of the same, these refinancings that were going on, right? It was. This was, in fact, I think they pointed out, the seventh time in 15 or 20 years that they had refined the property. The values went up. You come back to Judge Dennis's question, and you were saying you wanted to say this durable power of attorney, which had been used otherwise in these transactions — Once. Once. In the 2005 transaction. But it was not valid for any other transaction other than that single one. It hadn't been used otherwise. Just in the 2005 transaction and in the one we're challenging, 2007, two years later. That's the only time the power of attorney was used in connection with any of the refinancings. Now, the effect — the legal effect of not having the consent of the spouse in writing is that the lien is unenforceable. That's one effect. That is, they cannot foreclose on the lien. The other effect, which we have also pled for, is the draconian remedy, as the court says, that they are required to forfeit back to the foo stocks the money they paid under the void lien. And that was $1,300,000. They got into the note in 2007. They paid it for years and years. And those are two remedies that are in the Section 50XI, which is a stand-alone clause. It's not connected to the notice provisions. It's a stand-alone clause that says if a deed of trust, if a homestead finance transaction has been closed with no bousal consent, then the lender has to forfeit the money paid pursuant to that transaction. So you have two — in that particular clause, you have two different remedies. One is — and they're both available to us. One is the lien can't be foreclosed. The second is that they have to forfeit our money. Now, unless we feel — So you're seeking invalidation of the transaction and a forfeiture back to them of the monies paid in, in a fact scenario where, admittedly, they haven't paid the money? In other words, the money they did pay is to be forfeited to them, back to them by the money. What's the status of the property now? The postdocs are still in the property. It's not posted for foreclosure. No action has been taken to foreclose on the property. And we're waiting for this court's determination. Since all this began, when was the last time they paid money on the — It was right before I got into the case. I think they had just forfeited — I mean, just defaulted. And that would have been about April of 15, March or April of 15. And that's — because I got into the case in April of 15. The Supreme Court of Texas came down and said these lien — the Constitution means what it says in June of 15. I said, well, you know, that really throws my whole balance off. This has been in default since 2015, so your clients have not paid any money since then. And this has all been hanging in the balance until this is resolved in court. So wait until the court makes a decision. That's what — we don't know of any other way to resolve it. We've tried. Okay. It seems like one of these cases that somewhere back when could have, should have — Well, that's what happened. — other than the Fifth Circuit ruling eminently on Texas constitutional law and a foreclosure. I mean, you're here where you should be, but it just doesn't seem like a pronouncement from Mount Olympus is what was needed here when, you know, the facts are pretty much undisputed in terms of the amount of the debt. There's been no money paid on the debt since 2015. Durable power of attorneys on these other transactions. They're still living in the House and so forth. But anyway, we do what we do. I agree with the equity that the court's talking about. I understand the equities. But lest we feel too sorry for the bank and feel like the food stocks took advantage of the bank with all their hoards of larders and the title company with all their larders, tricked them into some kind of transaction, they get a right of separation back to a good lien. So it's not going to be — you know, it has to be calculated by the court below. But if they can find a valid lien back in the title that they paid, then they have a right to separate. But they can't foreclose. And they do have to give credit against whatever their separation is for the $1.3 million that we actually paid on the note. You know, the deed of trust has been changed now. I think — I doubt this case is going to have a great deal of forward-looking effect because all of the lenders understand you've got to put the consent in. Most of them do it as a separate document. Some of them do it as including it in the deed of trust itself. Specific words that say, I consent to the lien. Just what the Constitution requires. And it's so, so simple. And why it wasn't done in this case, you cannot fault the food stocks. They didn't draw any of the documents. They just — when they said sign, they had a set of documents a half-inch thick. And they just put — or Dr. Foodstock just put his name on it. And his wife had no concept even the transaction was going on. She could not possibly have been implied to consent to it. So this is — this is the issue that we see in the cases that the deed of trust simply doesn't have these words of consent in it. The closing does not have any words of consent in it. The power of attorney upon which the closing is based didn't have any words of consent in it. And it was not even part of the transaction. This particular transaction wasn't even thought of at the time the power of attorney was executed. And so she couldn't have had this in mind, to be consenting to her, to allow him to consent to it for her. All right. All right. Thank you, Mr. Goldman. Thank you. We have your opening argument in favor of rebuttal time. We'll hear from the bank. Mr. Oliver? Goldman says, gotcha. May it please the Court, Your Honor. Andrew — Louis Andrew Oliver for Appellee Bank of America, N.A. I will — I was planning on first addressing the appellant's arguments regarding the Texas Constitution and Texas Administrative Code and then addressing the specific durable power of attorney at issue in this case. If the Court would prefer I first address my argument on the durable power of attorney, I will — No, you can stay with the — you know, the plan you've gone with. Certainly, Your Honor. Thank you. Essentially what Dr. and Mrs. Foustock are asking this Court to do is to disregard the constitutional and regulatory framework in place at the time the home equity loan was made to them, turning first to subsection U of Article 16, Section 50 of the Texas Constitution. This is a safeguard provision, and it authorizes the Texas legislature the power to delegate to one or more state agencies the ability to interpret the regulatory — or, excuse me, the provisions of the Texas Constitution dealing with home equity loans, and then issue regulations that identify for a lender what it needs to do in order to comply with the Texas Constitution. Section 50U specifically states that if a lender complies with the regulations then in place, then that act is compliance with the Constitution itself. And given the forfeiture remedy that exists if a lender violates the Texas Constitution, it is fundamentally important that they be allowed to rely upon the regulations in place. Now, as authorized by 50U, the Texas legislature delegated to the Texas Finance Commission and the Credit Union Commission the authority to issue regulations that interpret 50A6, which is the home equity lending section of the Texas Constitution. And they then issued Section 153.15 of the Texas Administrative Code, which authorizes a lender to accept a properly executed power of attorney that authorizes the attorney, in fact, to execute closing documents on behalf of the owner. Now, turning first to the argument raised by Dr. and Mrs. Fustock that the phrase properly executed as it existed in subsection 2 of Section 153.15 at the time the home equity loan closed meant that a power of attorney had to be executed at the office of an attorney, lender, or title company. Quite honestly, Your Honor, I believe the plain language of the statute should control on that point. First, the statute uses the word accept, which necessarily implies something executed prior to the closing, and properly executed is not synonymous with constitutionally valid. If the Finance Commission and Credit Union Commission wanted to include a restriction on where a power of attorney could be executed, they could have included the specific locations in subsection 2, just as they did, for example, in subsection 1 of 153.15 where they identified the specific locations where the actual closing of a home equity loan needs to occur. However, no such language is in subsection 2. Furthermore, in the case of Finance Commission of Texas v. Norwood, this exact issue came up. And that, again, necessarily implies that prior to Norwood, the version of 153.15 that was in effect allowed a power of attorney to be executed in a location other than the office of an attorney, lender, or title company. Why else would it be raised? And furthermore, if you look at the post-Norwood amendments to section 153.15, which were made in order to get that statute in compliance with Norwood, language was added to 153.15, which indicated the specific locations where a power of attorney needed to be signed. With regard to the ruling in Norwood that a power of attorney now has to be executed in the office of an attorney, lender, or title company, that ruling should not be retroactive as urged by Dr. and Mrs. Foustock. The Texas Supreme Court, in that opinion, discusses section 50U at length. They talk about the history of it, it talks about the reasoning behind it, and basically says that given the forfeiture provision, a better system exists whereby a lender can rely on regulations that it can follow in order to close a home equity loan instead of subjecting its loan to risk of forfeiture in the development of a body of law through litigation that will ultimately tell lenders what they can and can't do when making home equity loans. And I believe, again, that Norwood is clear that it is not retroactive in this holding. Norwood itself or what's come out since say that it has prospective application only? Could you repeat the question, Your Honor? I'm sorry. I'm violating my own rules. Does Norwood itself or cases that have construed it since expressly say that it's holding is prospective only? The cases since Norwood have not discussed whether or not it is prospective or retrospective, and I'm referring to the Wood case, the Strausberger case, and the Garofalo case, which are the other Supreme Court opinions which Dr. Foostock and Mrs. Foostock in Bank of America are disagreeing about what they hold. And none of those cases go to the issue of whether or not that holding is retrospective or not. Dr. and Mrs. Foostock make two arguments regarding the home equity loan documents that were used for the home equity loan at issue in this appeal. The first is a more general issue in that the documents themselves do not evidence the consent of Malak Foostock. And then there is a more specific argument that the home equity lien contract and deed of trust does not include a forfeiture provision. Now, turning first to the more general argument regarding the consent, plaintiffs are first, or excuse me, Dr. and Mrs. Foostock are first referring to section 50A6 subpart A, which just simply states a home equity loan must be made upon the written consent of an owner. There is no mandated form or promulgated language that needs to be included in a document in order to evidence the consent. And the regulatory interpretation of that constitutional provision, which is section 153.2 of the Texas Administrative Code, similarly does not include any sort of magic words that a lender needs to include in its loan documents in order to evidence consent. There's just no support in either the Constitution or the regulations in place that makes such a finding. Essentially, what Dr. and Mrs. Foostock are saying is, and I'm paraphrasing here, in the home equity lien contract and deed of trust, instead of saying, I hereby voluntarily grant a lien on my homestead, the lender, Bank of America, should have instead said, I hereby consent to grant a lien on the homestead. And again, there's just nothing that supports such an interpretation of the Constitution or the regulations in place. Furthermore, Dr. Foostock and Malak Foostock do not argue that at least as far as Dr. Foostock was concerned, the execution of the home equity lien contract and deed of trust and all the other documents he signed when making this $2 million home equity loan evidence his voluntary agreement and consent to the home equity lien in question. I mean, I don't think there is any basis for him to say that he was not consenting and agreeing to entering into the home equity loan transaction. And as far as the law is concerned, Malak Foostock, having executed the durable power of attorney, is similarly situated. And if the documents are sufficient to grant consent for Dr. Foostock, they are similarly sufficient to evidence the written consent of Malak Foostock. Now, Dr. Foostock and Malak Foostock also make a claim that the home equity loan does not contain the mandated forfeiture provision contained in the Texas Constitution. And I think it's important to note that Bank of America does not agree with that contention. The loan does include the mandatory forfeiture provision. Essentially, what Dr. Foostock and Malak Foostock are arguing is that the constitutional provision found in Section G of Article 16, which requires a notice that has a promulgated form in it, needed to essentially be restated in the home equity lien contract and deed of trust. However, Section G, 50G of the Constitution, does not require that promulgated form be repeated in the home equity lien contract and deed of trust. What the home equity lien contract and deed of trust makes clear is that it is a home equity loan and lien that are being made pursuant to 50A6. And a home equity loan, like many other forms of transactions, is closed using multiple documents. And you have to look at all of those documents together to evidence and come to what the complete agreement of the parties is. Essentially, the multiple references throughout the document that say the loan is being made pursuant to 50A6, evidence that it is being made pursuant to 50A6, and that notice document explain to Dr. and Mrs. Foostock what that meant. Now, unless the Court has any other questions on the constitutional and regulatory arguments, I will now turn to the power of attorney arguments. Quite frankly, Your Honor, the durable power of attorney by Malak Foostock is short, relatively plainly written, and it is objectively unambiguous when it grants full power and authority to do and perform all and every act necessary to refinance the home. Yes, it is specific in that it only granted Dr. Foostock the ability to refinance their home, but the grant of authority included within that specific intent is incredibly broad. When Malak Foostock executed that durable power of attorney, she had been previously involved in five refinancing transactions at the home. She clearly was experienced in refinancing transactions and knew or should have known exactly what powers she was delegating to her husband as her attorney-in-fact. What's the best, what's the most on-point Texas case? It says what you just said about the breadth and scope of the durable power of attorney, either in this context or in some other context. Surely there have been other claims that a durable power of attorney was limited to this, limited to that. Are there any immediate Texas Court of Appeals decisions or Supreme Court that opine, not this factual context about the home financing, but my sense is that there would be cases where it's not exactly the case. And what I would refer the Court to is the N. Ray Miller case, which is cited in the memorandum opinion issued by the district court. And what that court holds and says is that a power of attorney does have to be strictly construed in order to be, when interpreting the power provisions in it. And the Bank of America position on that point is that even if you strictly construe the grant of authority contained in the durable power of attorney, it still evidences the consent of Malak Foustock as the principal granting the authority in the durable power of attorney to her husband, Abdel Foustock. If, and another way to look at this, Your Honor, is if a principal could, after the fact, pardon me, could after the fact subjectively modify the objectively unambiguous language in a power of attorney, it would completely undermine the use of power of attorneys because a third party such as Bank of America could not rely on the grant  Now, on the issue of the fact that this durable power of attorney was executed two years prior to the home equity loan in question, I think it's important to note that the power of attorney itself is titled as being durable. It is also in the refinance section of the power of attorney where the power of attorney uses plurals to describe what could be executed by Dr. Foustock. The power of attorney does not have any express termination, expiration date. The power of attorney does not reference any specific closing that it is being executed in connection with. The power of attorney had been used back in 2005 without objection from Malak Foustock. And as Dr. Malak Foustock can see, the power of attorney was not revoked at the time the home equity loan was made. Even if the power of attorney were not durable, the power of attorney will continue unless it is revoked by the principal or the principal dies. And as such, it could have been accepted by Bank of America and relied upon by Bank of America when it entered into the 2007 home equity loan transaction with Dr. and Mrs. Foustock. Was the durable power of attorney here just part of all the loan packaging that was pulled forward by Bank of America because this transaction had been done before? Or did the Foustocks or someone else offer it, you know, anew as part of this transaction? Do you understand my question? I think so in terms of was the power of attorney... Well, maybe I don't. Are you saying that... No, I'm just asking how did it come to be a part of the loan packaging in this case? I mean, in the earlier case, it was obviously expressly put forward by the Foustocks, you know, what, 2005 or something. So in that set of papers, deed of trust, all the packaging, it's in the mix for this. So then we get to the transaction at issue. So because it's Bank of America, it's another of a similar transaction that someone just pulled the document forward as part of the loan package here as opposed to, okay, here's a new power of attorney and no power. Do you understand? I do understand the question. I think due to the passage of time, the record is unclear. But presumably the power of attorney was certainly not discredited by Dr. Foustock. And neither Dr. Foustock or Mrs. Foustock have said in this specific case that the power of attorney was revoked when it was used. So it was presumably still in effect regardless of whether it was recycled, if you will, pulled from the prior closing file, or if it was again handed by Dr. Foustock to the bank when he was closing the loan. Was it referred to by the closing documents? Was it referred to by the closing documents? Yes, it was. And since that every single closing document signed by Dr. Foustock was also individually, was also signed by him as the power of attorney for Malak Foustock clearly evidencing the intent that there was a power of attorney in the 2007 home equity loan transaction which was, which is at issue. Where was that power of attorney physically at that time? It is unclear from the record, Your Honor, due to the passage of time. I don't file in a public record or anything like that. It was not filed a record that I'm aware of, Your Honor. I have not seen a recorded copy of the power of attorney in the official public records of Harris County, which is where the property is located. Unless the court has any other questions, this concludes my presentation. Thank you, Your Honor. Just one last question. Yes, Your Honor. Did you agree with my question to counsel opposite? I was just asking about the status of the matter. He says they're still in the home and all of that. My comment on that is, you know, we've certainly, you know, we've mediated this matter. We've tried. I unfortunately think that the economics of the amount of the loan, the past due interest, everything else has made it difficult for Dr. and Mrs. Foustock and the bank to come to some middle ground. Well, it means they're still occupying the property? Absolutely. Okay. And this is an addition. I mean, a home equity loan in Texas requires a court order to proceed, and so this matter would have to be finally resolved before the bank could proceed with obtaining a Rule 736 order under the Texas Rules of Civil Procedure. So this is all depending on us? That is correct, Your Honor. Deciding something. Okay. All right. Thank you, Your Honor. All right. Thank you. Appreciate it. All right. Any rebuttal, Mr. Comer? First, so much has been said about the power of attorney. The fact is the power of attorney was never used to grant a consent. Whether it was good or not good, it wasn't used to grant a consent. We contend it was not good because it was executed outside the required spot. And the Supreme Court in the Norwood case that we cited said that what properly executed power of attorney means, it has to be with the same protections for the spouse as executing of the other instruments, the deed of trust, for instance. That is, at an office of a title company lawyer or the lender. So the power of attorney arguments are really not, I don't think, all that material because the power of attorney was never actually used to sign a consent. We don't find a consent anywhere. The second point that I wanted to address that came up was in the forfeiture argument. There's two forfeiture provisions in the Constitution. One is, you know, all these letters, 50A, 6A, and then it says X. And that is a forfeiture provision that's contained in the notice that is required to be sent, which they did send. They sent the notice. However, the notice is not a contractual agreement to be bound to forfeit. It's only what has to be contractually agreed to in the papers if the loan is to be foreclosure eligible. The Garofalo Court, the Supreme Court made that very, very, that point very, very clear. If they want to ever foreclose on the note, they have to agree that they're going to be forfeited if they haven't gotten consent. They didn't ever agree to that. They sent a notice that does not form any kind of a contract. So the loan is not foreclosure eligible on that ground alone. We have a second thing, though. The forfeiture provision appears also in 50A, 6A, X, I, 11. This is a standalone. It doesn't have anything to do with the notice. It is that if a loan is closed without the consent of the spouses, there shall be a forfeiture and no foreclosure. So I'm trying to spotlight that because there's been a lot of intermingling of these two concepts in the appellee's briefs, and I want to separate them out. So that's, unless there's a question, those are my responses, and I'm leaving it to your good hands. I know Judge Dennis has dealt with this in that wonderful, remarkable case, Alexander's case, which I know he remembers, where Mrs. Alexander handled the case pro se all the way through and won. All right. Remarkable. She did get her lien invalidated.  Thank you. Thank you so much for your attention, Your Honors. Thank you, Mr. Coleman and Mr. Oliver, for your assistance with the briefing and answering the Court's questions. All right. The case will be submitted and will be decided.